**Sealed**
Public and unofficial staff access to this instrument are prohibited by court order

United States Courts
Southern District of Texas
**FILED**
*June 18, 2025*
Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | Criminal No. 4:25-cr- |
| § | |
| MARYAM "MEG" QAYUM, M.D., § | **4:25-cr-329** |
| TOMI-KO BOWERS, APRN, § | |
| LESTER "LAY" STOKES, § | |
| MELVIN SAMPSON, and § | |
| JARED WILLIAMS, R.Ph, § | |
| § | |
| Defendants. § | |

## INDICTMENT

The Grand Jury charges:

### GENERAL ALLEGATIONS

At all times material to the Indictment, unless otherwise specified:

1. The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

2. The CSA and its implementing regulations set forth which drugs and other substances are defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

3. A controlled substance assigned to "Schedule II" meant that the drug had a high potential for abuse, the drug had a currently accepted medical use in treatment in the United States,

or the drug had a currently accepted medical use with severe restrictions. A controlled substance assigned to "Schedule IV" meant that the drug had a lower potential for abuse relative to the drugs in the higher Schedules, including Schedule II; the drug had a currently accepted medical use in treatment in the United States; and abuse of the drug could lead to limited physical dependence or psychological dependence relative to drugs in the higher Schedules, including Schedule II.

4. Pursuant to the CSA and its implementing regulations:

    a. Oxycodone was classified as a Schedule II controlled substance. Oxycodone, sometimes prescribed under brand names, including Roxicodone, was used to treat severe pain. Oxycodone, as with other opioids, was highly addictive.

    b. Hydrocodone was classified as a Schedule II controlled substance. Hydrocodone, sometimes prescribed under brand names including Norco, Lortab, and Vicodin, was used to treat severe pain. Hydrocodone, as with other opioids, was highly addictive.

    c. Carisoprodol was classified as a Schedule IV controlled substance. Carisoprodol, sometimes prescribed under the brand name Soma, was a purported muscle relaxant and was highly addictive. The FDA recommended carisoprodol only for acute treatment for two to three weeks at a time.

5. It was well known that the combination of high-dose opioids, including oxycodone or hydrocodone, and carisoprodol, significantly increased the risk of patient intoxication and overdose. Moreover, prescribing oxycodone or hydrocodone and carisoprodol often created a significant risk of diversion because the two drugs, prescribed together, were often highly abused and sought for a non-legitimate medical purpose due to the increased "high" a user could experience from taking hydrocodone or oxycodone along with carisoprodol.

6. Accordingly, for a treating physician to prescribe the combination of high-dose opioids and carisoprodol for a legitimate medical purpose, the physician needed to determine, at a minimum, that the benefits of the drugs outweighed the risks to the patient's life.

7. Medical practitioners, such as pharmacists, physicians, and nurse practitioners, who were authorized to prescribe, distribute, or dispense controlled substances by the jurisdiction in which they were licensed to practice were authorized under the CSA to prescribe, or otherwise distribute or dispense controlled substances, if they were registered with the Attorney General of the United States. 21 U.S.C. § 822(b). Upon application by the practitioner, the Drug Enforcement Administration ("DEA") assigned a unique registration number to each qualifying medical practitioner including physicians, pharmacies, and nurse practitioners.

8. Chapter 21 of the Code of Federal Regulations, Section 1306.04 governed the issuance of prescriptions and provided, among other things, that a prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of her professional practice." Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

9. With exceptions not applicable here, only appropriately licensed and registered pharmacies could dispense controlled substances, and only pursuant to prescriptions issued for a legitimate medical purpose by an appropriately licensed and registered practitioner acting in the

3

usual course of his professional practice. *See* 21 C.F.R. §§ 1306.04 and 1306.06. The issuing physician and the pharmacist who filled the prescription for a controlled substance shared a corresponding responsibility for its proper prescribing and dispensing. *See* 21 C.F.R. § 1306.04.

10. All prescriptions for controlled substances were required to be "dated as of, and signed on, the day when issued and [were required to] bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner." 21 C.F.R. § 1306.05(a). "The refilling of a prescription for a controlled substance listed in Schedule II [was] prohibited." 21 C.F.R. § 1306.12(a); 21 U.S.C. § 829(a).

11. In Texas, in a clinical setting, only physicians who were licensed to practice medicine were permitted to prescribe Schedule II controlled substances, including oxycodone and hydrocodone.

12. In Texas, in a clinical setting, a physician could not delegate to a non-physician the authority to issue prescriptions for Schedule II controlled substances.

13. The Texas Prescription Monitoring Program ("PMP") was a database of all reported prescriptions for controlled substances that were issued and dispensed in Texas. The database was maintained by the Texas State Board of Pharmacy ("TSBP"). For all controlled substances dispensed, pharmacies were required to report to the PMP details that included: the patient's name, the particular controlled substance and dosage dispensed, the quantity dispensed, the number of days supplied, the prescribing physician's name, the date the prescription was issued, the

dispensing pharmacy's name, the type of payment, and the date the controlled substances were dispensed.

14. A "crew leader" was someone who found and paid individuals, some of whom were homeless or impoverished, to pose as chronic pain patients ("purported patients"); transported the purported patients (often in groups) to a clinic; coached the purported patients to fill out patient intake documentation to support a prescription for pain medication and paid for the "visit with the doctor" (i.e., the illegitimate prescription); took the purported patients (or just the illegitimate prescription) to the pharmacy; and paid for and took control of the prescription drugs, often to divert and sell them on the street for profit.

15. A "runner" was an individual that worked for a crew leader and "ran," or coordinated taking purported patients to clinics and pharmacies to obtain controlled substances. A runner often transported purported patients to the clinics or pharmacies for the crew leader, and often paid purported patients, clinics, and pharmacies on the behalf of the crew leader.

## DEFENDANTS AND RELEVANT ENTITIES

16. **MARYAM "MEG" QAYUM, M.D.** ("**QAYUM**"), a resident of Montgomery County, Texas, was a medical doctor and a purported physical medicine and rehabilitation specialist licensed to practice medicine in the State of Texas since in or around 1998. **QAYUM** principally practiced from Recare Health Clinic, PLLC ("Recare"), located at 22323 Loop 494, Suite 4, Kingwood, Texas, from in or around 2023 through the present, and previously located at 22704 Loop 494, Kingwood, Texas.

17.  **TOMI-KO BOWERS, APRN** ("**BOWERS**"), a resident of San Jacinto County, Texas, was an advanced practice registered nurse ("APRN"). **BOWERS** managed Recare for and with **QAYUM**.

18.  **LESTER "LAY" STOKES** ("**STOKES**"), a resident of Harris County, Texas, was a Recare employee.

19.  **MELVIN SAMPSON** ("**SAMPSON**"), a resident of Harris County, Texas, was a crew leader who coordinated with others paying and "running" individuals posing as patients to purchase illegitimate prescriptions at Recare and other clinics, and to have the illegitimate prescriptions filled by Houston-area pharmacies, including those affiliated with Recare.

20.  **JARED WILLIAMS, R.Ph. ("WILLIAMS")**, a resident of Harris County, Texas, was the owner and pharmacist-in-charge ("PIC") of Surge Rx Pharmacy, located in Pearland, Texas. **WILLIAMS** was licensed to practice pharmacy in Texas.

## COUNT 1
### Conspiracy to Unlawfully Distribute and Dispense Controlled Substances
### (21 U.S.C. § 846)

21.  Paragraphs 1 through 20 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

22.  Beginning in or around May 2022, and continuing through in or around June 2025, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, Defendants,

**MARYAM "MEG" QAYUM, M.D.,**
**TOMI-KO BOWERS, APRN,**
**LESTER "LAY" STOKES, and**
**MELVIN SAMPSON,**

knowingly and intentionally combined, conspired, confederated, and agreed with each other and others known and unknown to the Grand Jury, to violate Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(2), that is, to knowingly and intentionally unlawfully distribute and dispense, mixtures and substances containing a detectable amount of controlled substances, including oxycodone and hydrocodone, both Schedule II controlled substances, and carisoprodol, a Schedule IV controlled substance, knowing and intending that such distribution and dispensing was unauthorized.

### Purpose of the Conspiracy

23.     It was a purpose and object of the conspiracy for the Defendants and others to unlawfully enrich themselves by, among other things: (a) distributing and dispensing controlled substances without a legitimate medical purpose and outside the usual course of professional practice; (b) generating large profits from distributing and dispensing those controlled substances; and (c) diverting the proceeds from distributing and dispensing those controlled substances for their personal use and benefit.

### Manner and Means of the Conspiracy

The manner and means by which the Defendants and others sought to accomplish the purpose and object of the conspiracy included, among other things:

24.     **QAYUM** used her status as a licensed physician, her DEA Registration Number, and her medical practice Recare, to knowingly and intentionally prescribe controlled substances, including oxycodone, hydrocodone, and carisoprodol, knowing the prescriptions were not for a legitimate medical purpose and were being issued outside the usual course of professional practice.

25. The vast majority of **QAYUM**'s prescriptions were for the highest-strength immediate-release oxycodone pill (30 mg), the highest-strength hydrocodone-acetaminophen combination pill (10/325 mg), or the highest-strength carisoprodol pill (350 mg). In addition, the vast majority of **QAYUM**'s prescription for oxycodone and hydrocodone were for the same or substantially similar dosage units (100 to 120 pills).

26. **QAYUM** at times prescribed the highly addictive and dangerous combination of hydrocodone and carisoprodol, also known as the "Las Vegas Cocktail."

27. Crew leaders and runners, including **SAMPSON**, often paid purported patients to pose as patients in exchange for their obtaining prescriptions for controlled substances at Recare, authorized by **QAYUM**, and for filling those prescriptions at Houston-area pharmacies.

28. **QAYUM**, **BOWERS**, **STOKES**, and others at Recare often used code words, including "uncles" and "providers" when referring to the crew leaders and runners.

29. **SAMPSON** and other crew leaders, runners, and purported patients paid Recare cash in exchange for prescriptions for oxycodone, hydrocodone, carisoprodol, and other drugs that **QAYUM**, **SAMPSON**, and **STOKES** knew and intended were issued without a legitimate medical purpose and were issued outside the usual course of professional practice. **QAYUM** directed Recare employees to charge different amounts for purported appointments depending on the drug or drugs the crew leaders, runners, and purported patients sought—approximately $300 for hydrocodone, and approximately $400 or more for oxycodone.

30. When a purported patient brought to Recare by a crew leader did not receive a desired prescription, **QAYUM**, **BOWERS**, and others at their direction would give the crew leader a "credit" for the crew leader to apply towards a future purported patient at Recare.

31. **BOWERS** tracked Recare's daily receipts, tallying how much each customer (including purported patients, crew leaders, and runners) paid, and which crew leaders brought which purported patients.

32. **QAYUM** employed **STOKES** as an unlicensed security guard at Recare, whose job was to shepherd purported patients, crew leaders, and runners through the process of obtaining illegitimate prescriptions for hydrocodone, oxycodone, and carisoprodol; to protect **QAYUM** and other Recare staff; and to keep order in and around Recare.

33. **STOKES** served as gatekeeper for crew leaders and runners, including **SAMPSON**, assisting to expedite purported patients brought to Recare to receive illegitimate prescriptions. In exchange for that facilitation, **SAMPSON** and other crew leaders offered and paid **STOKES** cash "tips" on top of what Recare charged for the prescription.

34. Often, **QAYUM** neither saw, examined, nor interacted with the purported patients to whom she prescribed oxycodone, hydrocodone, or carisoprodol. Instead, non-physician individuals usually conducted perfunctory encounters with purported patients, after which **QAYUM** prescribed the controlled substances. Such non-physician individuals included nurse practitioners and individuals with medical degrees from outside the United States who were not licensed to practice medicine in Texas. **QAYUM** and **BOWERS** knew such prescriptions were unauthorized, and that they were issued without a legitimate medical purpose and outside the usual course of professional practice.

35. After **QAYUM** issued prescriptions for hydrocodone, oxycodone, and carisoprodol, **SAMPSON** and the other crew leaders and runners filled, or had purported patients fill, those prescriptions at complicit Houston-area pharmacies.

36. **SAMPSON** and the other crew leaders and runners obtained these unlawful prescriptions from **QAYUM**, had them filled by complicit pharmacies, and sold the pills onto the black market.

37. From in or around May 2022, through in or around June 2025, **QAYUM** issued prescriptions for the following drugs, among others, in the following amounts:

| QAYUM Prescribing (May 2022 – June 2025) | | |
|---|---|---|
| Drug | Prescriptions | Pills |
| Oxycodone 30 mg | 19,371 | 1,971,266 |
| Hydrocodone 10-325 mg | 8,198 | 841,078 |
| Carisoprodol 350 mg | 3,178 | 144,317 |
| Oxycodone 10 mg | 1,097 | 108,467 |
| Oxycodone 20 mg | 446 | 44,070 |
| TOTAL | 32,290 | 3,109,198 |

38. From in or around November 2022, through in or around January 2025, **QAYUM**, **BOWERS**, and their co-conspirators deposited, and directed others to deposit, approximately $4,454,517 in cash into an account held in the name of Recare at Austin Bank, ending in *1179 ("Recare *1179").

39. On or about March 27, 2025, federal authorities executed search and seizure warrants on Recare and Recare *1179, respectively, among other premises and accounts. For a brief time, **QAYUM**, **BOWERS**, **STOKES**, and their co-conspirators slowed Recare's operations, refusing to prescribe to "new" purported patients. However, even during the lull, **QAYUM**, **BOWERS**, **STOKES**, and their co-conspirators continued selling prescriptions for hydrocodone, oxycodone, and other controlled substances to crew leaders, including **SAMPSON**.

40. After federal authorities searched Recare and other premises, and seized funds in Recare *1179 and other accounts, **QAYUM** began depositing Recare's drug proceeds into other

accounts, including an Austin Bank account in the name of Sizzle Property LLC, ending in *2219 ("Sizzle *2219").

41. On or about May 14, 2025, **QAYUM**, **BOWERS**, **STOKES**, and their co-conspirators reopened Recare to "new" purported patients.

All in violation of Title 21, United States Code, Section 846.

### COUNTS 2 through 5
### Unlawfully Distributing and Dispensing Controlled Substances and Aiding and Abetting
### (21 U.S.C. § 841 & 18 U.S.C. § 2)

42. Paragraphs 1 through 20 and Paragraphs 23 through 41 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

43. On or about the dates specified below, in the Houston Division of the Southern District of Texas and elsewhere, Defendant,

**MARYAM "MEG" QAYUM, M.D.,**

aiding and abetting, and aided and abetted by, others known and unknown to the Grand Jury, did knowingly and intentionally distribute and dispense the controlled substance alleged below, knowing and intending that such distribution and dispensing was unauthorized:

| Count | Controlled Substance | On Or About Date | Pills | Purported Patient |
|---|---|---|---|---|
| 2 | Hydrocodone 10/325 mg | April 18, 2024 | 100 | H.R. |
| 3 | Hydrocodone 10/325 mg | June 27, 2024 | 100 | H.R. |
| 4 | Hydrocodone 10/325 mg | September 12, 2024 | 100 | H.R. |
| 5 | Hydrocodone 10/325 mg | November 20, 2024 | 99 | H.R. |

Each in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), and Title 18, United States Code, Section 2.

11

## COUNTS 6 through 9
**Unlawfully Distributing and Dispensing Controlled Substances and Aiding and Abetting**
**(21 U.S.C. § 841 & 18 U.S.C. § 2)**

44.     Paragraphs 1 through 20 and Paragraphs 23 through 41 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

45.     On or about the dates specified below, in the Houston Division of the Southern District of Texas and elsewhere, Defendants,

**MARYAM "MEG" QAYUM, M.D.,**
**TOMI-KO BOWERS, APRN,**
**MELVIN SAMPSON,**
**LESTER "LAY" STOKES, and**
**JARED WILLIAMS, R.PH,**

aiding and abetting, and aided and abetted by, each other and others known and unknown to the Grand Jury, did knowingly and intentionally distribute and dispense the controlled substance alleged below, knowing and intending that such distribution and dispensing was unauthorized:

| Count | Controlled Substance | On Or About Date | Pills | Purported Patient |
|---|---|---|---|---|
| 6 | Oxycodone 10 mg | May 2, 2025 | 110 | E.B. |
| 7 | Oxycodone 30 mg | May 2, 2025 | 100 | D.W. |
| 8 | Oxycodone 15 mg | May 30, 2025 | 100 | E.B. |
| 9 | Oxycodone 30 mg | May 30, 2025 | 100 | D.W. |

Each in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), and Title 18, United States Code, Section 2.

## COUNTS 10 through 13
**Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity**
**(18 U.S.C. §§ 1957 and 2)**

46.     Paragraphs 1 through 20 and Paragraphs 23 through 41 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

47. On or about the dates specified below, in the Houston Division of the Southern District of Texas and elsewhere, Defendants,

**MARYAM "MEG" QAYUM, M.D. and  
TOMI-KO BOWERS, APRN,**

aiding and abetting, and aided and abetted by, each other and others known and unknown to the Grand Jury, did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, unlawful distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1); and conspiracy to distribute a controlled substance, in violation of Title 21, United States Code, Section 846, as follows:

| Count | Defendant(s) | On Or About Date | Approximate Cash Deposit | Account |
|---|---|---|---|---|
| 10 | QAYUM BOWERS | April 27, 2023 | $24,600 | Recare *1179 |
| 11 | QAYUM | November 3, 2023 | $23,000 | Recare *1179 |
| 12 | QAYUM | February 22, 2024 | $25,500 | Recare *1179 |
| 13 | QAYUM BOWERS | May 9, 2025 | $10,020 | Sizzle *2219 |

Each in violation of Title 18, United States Code, Section 1957, and Title 18, United States Code, Section 2.

### NOTICE OF CRIMINAL FORFEITURE
**(21 U.S.C. § 853(a))**

48. Pursuant to Title 21, United States Code, Section 853(a), the United States of America gives notice to Defendants,

**MARYAM "MEG" QAYUM, M.D.,  
TOMI-KO BOWERS, APRN,  
MELVIN SAMPSON,  
LESTER "LAY" STOKES, and**

**JARED WILLIAMS, R.PH,**

that upon conviction of an offense in violation of Title 21, United States Code, Sections 841 and 846, the following is subject to forfeiture:

    a.    all property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such violation; and

    b.    all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

The property to be forfeited includes, but is not limited to, the following:

    a.    Approximately $40,000 in U.S. Currency seized on or about March 27, 2025;

    b.    Approximately $11,361.88 seized from Recare *1179 on or about March 27, 2025;

    c.    Approximately $14,210.17 seized from an account at Austin Bank, account ending in *1807 on or about March 27, 2025;

    d.    Approximately $1,740.17 seized from Sizzle *2219 on or about March 27, 2025;

    e.    Approximately $27,338.74 seized from an account at Woodforest Bank, account ending in *1210; and

    f.    2025 Toyota Crown Signia (VIN: JTDACAAJ9S3006003).

## Money Judgment and Substitute Assets

49.    The United States will seek the imposition of a money judgment against the Defendants upon conviction.

50.    Defendants are notified that in the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the Defendants up to the amount of the money judgment as to the Defendants.

### NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(1))

51.    Pursuant to Title 21, United States Code, Section 853(a), the United States of America gives notice to Defendants,

**MARYAM "MEG" QAYUM, M.D. and**
**TOMI-KO BOWERS, APRN,**

that upon conviction of an offense in violation of Title 18, United States Code, Section 1957, any property, real or personal, involved in such offense, or any property traceable to such property. The property subject to forfeiture includes, but is not limited to, the following:

a.    Approximately $40,000 in U.S. Currency seized on or about March 27, 2025;

b.    Approximately $11,361.88 seized from Recare *1179 on or about March 27, 2025;

c.    Approximately $14,210.17 seized from an account at Austin Bank, account ending in *1807 on or about March 27, 2025;

d.    Approximately $1,740.17 seized from Sizzle *2219 on or about March 27, 2025;

e.    Approximately $27,338,74 seized from an account at Woodforest Bank, account ending in *1210; and

f.    2025 Toyota Crown Signia (VIN: JTDACAAJ9S3006003).

## Money Judgment and Substitute Assets

52. The United States will seek the imposition of a money judgment against the Defendants upon conviction.

53. The Defendants are notified that in the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the Defendant up to the amount of the money judgment as to the Defendant.

A TRUE BILL
Original Signature on File
FOREPERSON

NICHOLAS J. GANJEI
UNITED STATES ATTORNEY

LORINDA LARYEA
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

_____
DEVON HELFMEYER
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE
KATHRYN OLSON
ASSISTANT UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF TEXAS